**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| SHARP WEALTH ADVISORY, LLC;<br>SHARP CAPITAL ADVISORS, LLC;<br>SFG MANAGEMENT, LLC;<br>SHARP ERC, LLC; and<br>SHARP ACCOUNTING & TAX, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>STEPHAN A. COLGLAZIER;<br>ASE PRIVATE WEALTH LTD. CO.;<br>BELPOINTE ASSET MANAGEMENT, LLC;<br>And BELPOINTE FINANCIAL<br>HOLDINGS, LLC,<br><br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | <br><br><br><br>**Jury Trial Demanded**<br><br><br><br>Case No. ____________ |

## COMPLAINT

Plaintiffs Sharp Wealth Advisory, LLC, Sharp Capital Advisors, LLC, SFG Management, LLC, Sharp ERC, LLC, and Sharp Accounting & Tax, LLC (collectively "**Sharp Financial**" or the "**Company**"), by and through their undersigned counsel, Fisher & Phillips LLP, files this Complaint against Defendants Stephan A. Colglazier ("**Colglazier**"), ASE Private Wealth Ltd. Co. ("**ASE**"), Belpointe Asset Management, LLC, and Belpointe Financial Holdings, LLC ("**Belpointe**", and collectively with Colglazier and ASE, the "**Defendants**").

## INTRODUCTION

1. This action seeks damages arising from the departure of a senior executive entrusted with some of Sharp Financial's most confidential strategic information and trade secrets. After accepting a new position as the Chief Investment Officer ("**CIO**") with ASE, a direct competitor, Colglazier misappropriated Sharp Financial's trade secrets, used those Sharp Financial trade secrets to immediately begin a solicitation campaign directed at Sharp Financial's clients, emailed himself documents from his Sharp Financial email account to his personal email account, surgically deleted emails from his Sharp Financial email account, and is now illegally using Sharp Financial trade secrets to benefit ASE and Belpointe and harm Sharp Financial.

2. In November 2023, Sharp Financial promoted Colglazier to be its CIO, paying him hundreds of thousands of dollars per year to lead, oversee, and manage the Company's investment platforms and strategies along with providing wealth-management services for certain Sharp Wealth Advisory, LLC clients.

3. As CIO, Colglazier was also instrumental in developing, maintaining, coordinating, and incorporating those strategies into Sharp's Integrated Financial Management solutions (the "**IFM Solutions**") which is the cornerstone of Sharp Financial's business model and the key to its differentiation in the highly competitive financial services and wealth advisory marketplace.

4. In his role as CIO, Colglazier was entrusted with some of Sharp Financial's most sensitive strategic and financial information, including confidential information concerning long-range planning, revenue, client lists and related confidential client data, financial projections, competitive strategy, investment-management strategy, customer initiatives, technology investments, broader strategic initiatives, and the Company's strategy concerning the IFM Solutions business model that includes business consulting and advisory, accounting, tax, investment banking, family office services, and wealth management and asset management services.

5. On August 12, 2026, Colglazier abruptly notified Sharp Financial that he was resigning, effective immediately. Colglazier sent his resignation at 8:06 a.m. ET and repeatedly asked that Sharp Financial confirm that it was "in the record" that Colglazier resigned before 9:00 a.m. ET.

6. The reason for that odd request became clear minutes *after* 9:00 a.m. ET, when a wave of Sharp Financial clients began transferring their accounts out of Sharp Financial and, on information and belief, to the Defendants.

7. In his August 12 resignation correspondence, Colglazier did not disclose to Sharp Financial that he was joining ASE as ASE's CIO, and would be offering investment advisory services through Belpointe.

8. ASE is a significant competitor of Sharp Financial, and in his role as ASE's CIO, Colglazier directly competes against Sharp Financial.

9. After Colglazier announced his immediate resignation, Sharp Financial conducted a standard review of his computer activity. That review reflected that, among other things Colglazier (a) surgically deleted certain of his Sharp Financial emails going back to 2024 and (b) emailed to his personal email account from his Sharp Financial email various documents and information. The Company's forensic review remains ongoing, and the full extent of Colglazier's electronic misconduct is not yet known.

10. Sharp Financial also learned that Colglazier stole from Sharp Financial the Company's strategic platform model strategies and related rules for implementation and management (the "**Model Strategies**"). The Model Strategies were proprietary and detailed financial modeling and planning strategies that the Company, through Colglazier, researched, developed, and implemented. As CIO, Colglazier, on the Company's behalf, developed and approved the Model Strategies and implemented them on Schwab's Money Manager marketplace, which is available to any advisor with Schwab to access.

11. Colglazier oversaw the Model Strategies, implemented them with other advisors and clients, and managed Sharp Financial's relationship with Schwab regarding the Model Strategies.

12. Implementing and ongoing management of the Model Strategies is a key element to Sharp Financial's growth strategy.

13. Colglazier also oversaw the development and implementation of Sharp Financial's Strategic Asset Management platform ("**SAM**"), which comprises certain of Sharp Financial's proprietary strategy developed on top of (and integrating) third-party models.

14. Colglazier further developed and maintained client-specific stock and equity portfolio and trading strategies.

15. And Colglazier oversaw Sharp Financial's Tactical Asset Management platform ("**TAM**"), which comprises certain of Sharp Financial's proprietary strategies layered on top of (and integrating) third-party algorithms.

16. The specific use and allocation of the Model Strategies, the SAM, and the TAM, as well as the IFM Solutions, constitute Sharp Financial's core trade secrets (the "**Technical Trade Secrets**") make up, in part, the "secret sauce" that sets Sharp Financial apart from its competitors (specifically including ASE).

17. Part and parcel of the Technical Trade Secrets is tax strategy, planning, management, and compliance. The Company's clients that left Sharp Financial as part of Colglazier's disloyal raid received these tax services, which are bundled into the fees Sharp Financial received from the clients. Without compensation flowing from their bundled fees, the Company is hamstrung in providing tax services to these clients, including meeting certain Fall 2026 tax-filing deadlines, which could lead to significant harm both to the clients and to the Company.

18. Colglazier's laissez faire approach to the tax needs of the Company's clients reflects yet another violation of his fiduciary duties, both to the clients and to the Company.

19. Not only did Colglazier steal the Technical Trade Secrets; as a result of his theft, Sharp Financial is no longer able to implement and manage certain of those strategies for the Company's clients. This is not merely a case where a rogue former employee copies the trade secrets on the way out the door and the former employer retains them. Here, Colglazier ensured that he took the Technical Trade Secrets **and** Sharp Financial would not have the tools to continue applying the Technical Trade Secrets for its clients. This included, without limitation, Colglazier's failure to reduce certain core Sharp Financial strategies and tools to writing.

20. That theft has wrought dramatic harm on the Company's clients, who have entrusted Sharp Financial to manage their investments and ensure their financial well-being.

21. Colglazier's conduct violated his fiduciary duties to the Company, and also violated (and continues to violate) the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* (the "**DTSA**") and the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001, *et seq.* ("**FUTSA**").

22. On August 21, 2026, the Company sent Colglazier a written demand reminding Colglazier of his post-employment obligations and asking him to confirm, by August 28, 2026, his receipt of the letter, his understanding of his post-employment

obligations, and that he had not retained, used, or disclosed any of the Company's confidential information. **Exhibit 1**.

23. Colglazier ignored the August 21 letter.

24. On September 6, 2026, the Company sent Colglazier a second written demand concerning his ongoing misconduct. **Exhibit 2**. In the September 6 letter, the Company demanded, among other things, that Colglazier return to Sharp Financial all of the materials he retained or to which he had access, agree to a forensic inspection and remediation of his devices and electronic accounts, disclose all instances where he used non-public information related to Sharp Financial, and agree not to use Sharp Financial confidential information moving forward. The Company also demanded monetary recompense for the damage Colglazier did to the Company.

25. On September 6, 2026, the Company also sent cease and desist letters to ASE and Belpointe concerning Colglazier's misconduct. **Exhibits 3, 4.**

26. Through counsel, Defendants responded to the Company's September 6 letters, denied wrongdoing, and refused to cease their illegal conduct or engage in the forensic remediation process necessary to protect the Company.

27. Defendants' acts have damaged and jeopardized Sharp Financial's business by unfair methods. Defendants' actions have caused, and continue to cause, substantial and incalculable damage.

28. Based on his conduct, Sharp Financial reasonably believes that Colglazier has used and continues to use Sharp Financial's trade secrets and confidential information to benefit ASE and Belpointe, all while harming Sharp

Financial's clients. Colglazier, acting as an agent of ASE and Belpointe, knowingly misappropriated Sharp Financial's trade secrets to the detriment of Sharp Financial (and its clients) and the benefit of Defendants.

29. Sharp Financial seeks an order requiring Defendants to return to Sharp Financial all records and/or documents in any form, received or removed from Sharp Financial by Colglazier, containing information pertaining to clients Colglazier served or whose names became known to Colglazier while employed by Sharp Financial including, without limitation, any client list or documents replicated or "recreated" by Colglazier from memory or otherwise, including by using his memory to look up client names in public sources. Sharp Financial also seeks an order prohibiting further solicitation of Sharp Financial clients by Defendants. This relief is necessary to end the Defendants' unlawful activities, which include misuse of Sharp Financial's trade secrets and unfair competition.

30. Sharp Financial also seeks monetary damages, and damages for Colglazier's ill-gotten gains arising from his breach of his fiduciary duties and the duty of loyalty he owed to Sharp Financial.

## PARTIES AND JURISDICTION

31. Plaintiffs Sharp Wealth Advisory, LLC, Sharp Capital Advisors, LLC, SFG Management, LLC, Sharp ERC, LLC, and Sharp Accounting & Tax, LLC are Pennsylvania Limited Liability Companies whose ultimate members are Pennsylvania citizens.

32. Defendant Stephan A. Colglazier is an individual who, on information and belief, currently resides at 2163 Pebble Beach Way, Fernandina Beach, Florida, 32034.

33. Colglazier worked for Sharp Financial primarily from his home in Fernandina Beach, Florida from January 2022 until August 12, 2026.

34. Defendant ASE Private Wealth Ltd. Co. is a South Carolina Limited Liability Company with its principal place of business at 131 Falls Street, Suite 301, Greenville, South Carolina, 29601. On information and belief, no members of ASE Private Wealth Ltd. Co. are Pennsylvania citizens.

35. Defendant Belpointe Asset Management, LLC is a Connecticut Limited Liability Company with its principal place of business at 500 Damonte Ranch Parkway, Building 700, Suite 700, Reno, Nevada, 89521. On information and belief, no members of Belpointe Asset Management, LLC are Pennsylvania citizens.

36. Defendant Belpointe Financial Holdings, LLC is a Connecticut Limited Liability Company with its principal place of business at 500 Damonte Ranch Parkway, Building 700, Suite 700, Reno, Nevada, 89521. On information and belief, no members of Belpointe Financial Holdings, LLC are Pennsylvania citizens.

37. ASE and Belpointe provide financial services, including wealth management, in Florida.

38. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Sharp Financial asserts claims arising under federal law, including under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* *See* 18 U.S.C. § 1836(c) ("The district courts of the United States shall have original jurisdiction over civil actions brought under this section.").

39. The Court also has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

40. The Court also has supplemental jurisdiction over Sharp Financial's related state-law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Sharp Financial's federal claims, including Defendants' unauthorized acquisition, retention, use, and threatened use of Sharp Financial's confidential and trade secret information for their own benefit.

41. The Court has personal jurisdiction over Colglazier because Colglazier is a Florida citizen.

42. The Court has personal jurisdiction over ASE and Belpointe under Florida's long-arm statute, Fla. Stat. § 48.193, because ASE and Belpointe purposefully availed themselves of Florida, operated or conducted business through a Florida-facing competing business, committed tortious acts connected to Florida, and

caused injury through conduct directed through and from Florida, including, without limitation, by their affiliation with and employment of Colglazier.

43. Specifically, the Court has personal jurisdiction over ASE and Belpointe under Fla. Stat. § 48.193(1)(a)(1) because ASE and Belpointe operated, conducted, engaged in, or carried on a business or business venture in Florida that compete with Sharp Financial.

44. The Court also has personal jurisdiction over ASE and Belpointe under Fla. Stat. § 48.193(1)(a)(2) because ASE and Belpointe committed tortious acts within Florida and/or committed tortious acts outside Florida that were directed into Florida or carried out through Florida-based conduct, including, without limitation, misappropriation of trade secrets, aiding and abetting Colglazier's breaches of his fiduciary duties and duty of loyalty, and tortiously interfering with Sharp Financial's business opportunities and contractual relations.

45. Florida courts recognize that tortious acts for purposes of Florida's long-arm statute may be committed through electronic, telephonic, or written communications directed into or from Florida.

46. ASE and Belpointe's contacts with Florida are not accidental, isolated, or passive. Among other things, ASE and Belpointe hired Colglazier in Florida and, on information and belief, Colglazier continues to work for ASE and Belpointe from Florida.

47. ASE and Belpointe's Florida-facing business activity is directly connected to Sharp Financial's claims because they are competing with Sharp Financial while using, benefiting from, or threatening to use Sharp Financial's confidential information, client data, and trade secrets.

48. ASE and Belpointe should reasonably have anticipated being haled into court in Florida because ASE and Belpointe hired Colglazier to work for them in Florida and hold themselves out as conducting business in Florida.

49. Exercising personal jurisdiction over ASE and Belpointe comports with due process because ASE and Belpointe purposefully established minimum contacts with Florida, Sharp Financial's claims arise out of or relate to those contacts, and the exercise of jurisdiction is fair, reasonable, and consistent with traditional notions of fair play and substantial justice.

50. Venue is proper in the United States District Court for the Middle District of Florida because a substantial part of the events and omissions giving rise to Sharp Financial's claims occurred in this District, including Colglazier's former employment with Sharp Financial, Colglazier's misappropriation of Sharp Financial's trade secrets, and Defendants' misuse of Sharp Financial's confidential, proprietary, and trade secret information in connection with that Florida-based conduct. *See* 28 U.S.C. §§ 89(b), 1391(b)(2).

## FACTUAL ALLEGATIONS

### I. Sharp Financial's Business and Customer Relationships, Storage of Trade Secret Information, and Trade Secret Protections

51. Michael H. Sharp, C.P.A., founded Sharp Financial in 1993. In the decades since, Michael Sharp and his team have grown Sharp Financial to seven offices across Florida, New Jersey, New York, and Pennsylvania, and Sharp Financial services clients across the country.

52. Sharp Financial provides a suite of personal and professional wealth management and wealth-complementary services including business advisory, accounting and tax, wealth management, asset management, investment banking, and family office including through development and implementation of the Technical Trade Secrets.

53. The Company dedicates considerable time, effort, and resources to marketing, brand recognition, employee education and training, service deliverables, and infrastructure, all with the purpose of building, maintaining, and growing lifelong client relationships.

54. In the ordinary course of its business, Sharp Financial develops, maintains, and protects valuable trade secrets including, without limitation, the Technical Trade Secrets, as well as non-public information about the Company's clients (the "**Client Information Trade Secrets**"). The Company records, stores, and accesses these trade secrets and confidential information from various platforms and accounts to which only certain Sharp Financial employees have access.

55. Sharp Financial intentionally limits access to these platforms and accounts because the information stored on them has considerable economic value to the Company and is further guarded to comply with the Federal Trade Commission's Safeguarding Rules under the Gramm-Leach-Bliley Act under which Colglazier, as a licensed investment adviser representative is also required to protect against the misappropriation of nonpublic information. This trade secret information shows who is a Sharp Financial existing or prospective client, who is predisposed to investments, who is a high-net worth individual, who is inclined to follow the advice of a financial planner, and the complementary and integrated financial and business needs for which the Company's clients pay. If that information fell into a competitor's hands, such information provides the competitor with information which (a) Sharp Financial has spent considerable time and resources compiling; (b) would allow the competitor to undermine Sharp Financial's relationships with its clients and advisors; and (c) is not otherwise publicly available.

56. In other words, the economic value of the subject information, if disclosed, would place Sharp Financial at a competitive disadvantage and the competitor at a competitive advantage.

57. Sharp Financial clients are not publicly identified as clients of Sharp Financial.

58. Although customer names may be found in public sources as general members of the public, the only way that they would be discernable as individuals with assets to invest and a demonstrated need and desire for investment and related

financial-management services, would be through an employee working with them at Sharp Financial.

59. Although individual clients are periodically subject to random solicitations from Sharp Financial competitors, no competitor can determine who Sharp Financial clients are and effectively target them and address their unique needs without access to, or specific knowledge of, Sharp Financial's trade secret customer data. In this way, maintaining the confidentiality of Sharp Financial's Client Information Trade Secrets provides Sharp Financial with a significant competitive advantage.

60. Sharp Financial's customer information, including the identity of Sharp Financial's customers, is required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations. The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent. 17 C.F.R. § 248.10. Nonpublic personal information is defined to include customer lists from financial institutions, even if those lists contain only names of Sharp Financial's customers because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D). Indeed, these regulations

also protect a customer's account information. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

61. Sharp Financial customers rightfully have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. Thus, customers understandably are concerned when former Sharp Financial employees, such as Colglazier, have access to their information and are using it to solicit their business on behalf of a new and different brokerage institution.

62. In other words, the damage to Sharp Financial's customer relationships has already occurred, is ongoing and is incalculable, as Sharp Financial cannot put a price on the value of its customer relationships or the damage caused when Defendants improperly misused confidential and trade secret customer information.

63. In addition to the confidential financial and business information described above, Sharp Financial has also spent years developing the Technical Trade Secrets.

64. The Model Strategies are detailed financial models and plans that the Company has researched, developed, and implemented to benefit its clients and to set itself apart from competitors. The Model Strategies require written implementation rules and guidelines; these are the "user manual" for how the Model Strategies are implemented and updated for clients.

65. The SAM and the TAM comprise proprietary Company strategies layered on top of (and integrating) third-party models and algorithms.

66. Unlike many wealth management firms, Sharp Financial offers a wide variety of wealth-adjacent services. The Company has spent considerable resources over decades developing its IFM Solutions to maximize those integrated offerings for its clients. Importantly, ASE – the firm to which Colglazier defected and at which he now serves as CIO – also offers integrated financial management services.[1]

67. Sharp Financial has implemented multiple security measures to protect its trade secrets, which constitute reasonable measures to protect and maintain its trade secrets under 18 U.S.C. § 1839(3)(A).

68. The security measures Sharp Financial has implemented include, without limitation, confidentiality certifications and electronic and computer-based data security, including:

a. Multi-Factor Authentication: Employees who have access to Sharp Financial's trade secrets and confidential information are provided with a Company-owned laptop, through which they can access Sharp Financial's platforms and accounts. These devices use a multi-authorization security procedure. An employee accesses the platform on their Company-issued laptop using a secure password. The platform or account then prompts the employee to enter a

---

[1] *See, e.g.*, ASE Private Wealth, https://www.aseadvisors.com/our-mission (last visited Sept. 16, 2026) (showing ASE offering private client, family office, pre-M&A, and institutional capital services).

multi-factor authentication code that has been sent to the employee's cell phone.

b. Cybersecurity: Sharp Financial maintains the highest level of cybersecurity protections including, without limitation, malware protection, virus protection, and 24-hour service for its networking, employees, laptops, platforms, and accounts.

## II. Colglazier's Employment with Sharp Financial

69. Sharp Financial hired Colglazier as the Senior Managing Director, Wealth Management, Southeastern U.S. Region on or around January 17, 2022. **Exhibit 5.**

70. Before joining Sharp Financial, Colglazier spent six years working as a Senior Portfolio Manager in the Private Wealth Group for Regions Asset Management.

71. The Company paid over $500,000 to Colglazier to purchase his book of business outright. As a result, during his employment at Sharp Financial, Colglazier did not have an independent book of business. He was handsomely paid to service Sharp Financial's clients. Sharp Financial's client list and client relationships were thus developed, maintained, and owned by Sharp Financial, not by Colglazier.

72. On or around November 30, 2023, Sharp Financial promoted Colglazier to Chief Investment Officer. **Exhibit 6.**

73. As CIO, Colglazier's responsibilities (and compensation) dramatically increased. The full scope of his CIO responsibilities included:

> **POSITION:**
>
> As Chief Investment Officer ("CIO") you will be responsible for leading, overseeing, and managing the investment platforms (Strategic, Tactical, Asset Management, and others as developed) and strategies of Sharp Wealth Advisory, LLC (the "Group" or "Sharp Wealth Advisory"). In addition to contributing to the Group's leadership, strategic vision, and execution, you will also be a member of the leadership team of The Sharp Financial Group and collaborate with Sharp's team members in delivering our integrated financial management solutions. Also, as CIO, you will represent the Group's investment strategies, and all related solutions to wealth advisors and clients. It is expected that in addition to having an in-depth understanding of financial markets you will clearly communicate and articulate investment strategies to wealth advisors and clients alike. Your responsibilities will include, but not be limited to, the following:
>
> - Manage and grow the Group's Assets Under Management "AUM" with a focus on wealth advisor experience, client experience, investment approach and process efficiencies.
> - Evolve and manage the Group's investment platform, including developing value-added offerings for wealth advisors to serve their clients and grow their client bases.
> - Oversee all investment strategies, ensuring an optimal portfolio of offerings, periodic product diligence, and continuous performance tracking, conforming with compliance requirements and operating at scale.
> - Collaborate with the Group's team and Sharp's overall team and assist in marketing, growing and delivering Sharp's integrated financial management solutions.
> - Market the Group's investment strategies, platform offerings, and wealth management solutions through external media positioning, speaking opportunities, and development and delivery of regular communications and related market commentary to wealth advisors and clients.
> - Communicate our value proposition to internal and external stakeholders including existing clients and new prospects.
> - Recruit new wealth advisors.
> - Develop, motivate, and lead an investment management team; attract, recruit and retain key stakeholders.
> - Continued development, expansion, and service of your client base.

*Id.* at 2.

74. From November 2023 onward, Colglazier was a trusted member of Sharp Financial's executive leadership team and worked closely with the team to develop Sharp Financial's broader business strategy.

## III. Colglazier's Resignation From Sharp Financial

75. On August 12, 2026, without notice, at approximately 8:06 a.m. ET, Colglazier sent an email purporting to resign as CIO effective immediately. **Exhibit 7**. The resignation email did not include any information regarding Colglazier's new employer.

76. Attached to the email was a hastily prepared template resignation letter which Colglazier had not updated with Sharp Financial's contact information. Indeed, the letter was addressed to "Dear X and Y":

> August 10, 2026
>
> Dear X & Y,
>
> Please accept this letter as my resignation as Chief Investment Officer for Sharp Financial, effective immediately 8/12/2026.
>
> I am grateful for the time and work we shared, building on the foundation of your vision for tax and wealth management advisory services, something I hold dear. We served well through wealth management and portfolio construction over the past few years, and my passion remains investment management, which I plan to continue.
>
> My appreciation for this work and for what we built together does not end here. Should the opportunity arise, I would welcome a conversation about working together again in some capacity.
>
> Thank you again for the opportunity.
>
> Sincerely,
>
> Stephan Colglazier, CFA, CAIA

*Id.*

77. Notably, the unsigned template resignation letter was dated August 10, 2026 and not August 12, 2026.

78. Colglazier did not register with Belpointe as an investment advisor until August 21, 2026. **Exhibit 8**. Nevertheless, within minutes of his resignation from Sharp Financial, clients began transferring their investments out of the Company and, on information and belief, to ASE and/or Belpointe.

79. Colglazier did not provide any advance notice, allow for any transition plan, or otherwise ensure that he fulfilled his fiduciary duties as Sharp Financial's CIO as he did not wind down his employment with Sharp Financial.

80. Colglazier also failed to document or reduce many key Sharp Financial models, strategies, and implementing rules, including many of the Technical Trade Secrets, to writing, as he was obligated to do, and which would allow Sharp Financial to continue implementing those strategies following his departure.

81. Colglazier's immediate departure wrought havoc on Sharp Financial's internal operations and caused significant disruption because Colglazier did not transition his duties as CIO. That disruption has resulted in harm to Sharp Financial's clients and significant expense and investments of senior executive time to remedy the mess Colglazier left behind when he bolted out the door.

## IV. Colglazier Steals The Technical Trade Secrets and Uses Sharp Financial Confidential Information and Trade Secrets to Illegally Compete with Sharp Financial and Disrupt Sharp Financial's Relationships with its Clients

82. Shortly after his resignation from Sharp Financial, the Company discovered that Colglazier had stolen the Model Strategies.

83. As a result of his misappropriation, not only does Sharp Financial's competitor, ASE, have access to and, on information and belief, is using, the Model Strategies, but Sharp Financial is not able to use the Model Strategies itself.

84. Further, ASE and Belpointe now have access to the broad array of Technical Trade Secrets which Colglazier was charged with developing and implementing for Sharp Financial. Even if ASE and Belpointe do not use those specific models, methods, or procedures, they have an unfair competitive advantage insofar as they know how Sharp Financial's trade secret business strategy is developed and implemented, allowing them to unfairly compete with the Company.

85. For nearly 25 years, Colglazier has been, and advertises himself as, a Charted Financial Analyst (a "**CFA**"). As a CFA, Colglazier is bound to follow the CFA Institute's Code of Ethics and Standards of Professional Conduct. **Exhibit 9**. Among those obligations, Colglazier is obligated to refrain from "engag[ing] in any professional conduct involving dishonesty, fraud, or deceit or commit any act that reflects adversely on [his] professional reputation, integrity, or competence." *Id.* at 1, § I.D. He is also required to "act for the benefit of [his] clients and place [his] clients' interests before . . . [his] own interests." *Id.* at 2, § III.A. He must also "keep

information about current, former, and prospective clients confidential." *Id.* at 2, § III.E. And Colglazier was required to "act for the benefit of [his] employer and not deprive [his] employer of the advantage of [his] skills and abilities, divulge confidential information, or otherwise cause harm to [his] employer." *Id.* at p. 3, § IV.A. Put simply, Colglazier had additional ethical and professional obligations to act in good faith, act for Sharp Financial's benefit, and not use or disclose client information.[2] As a long-time CFA, Colglazier knew that his theft of the Model Strategies and other client information was unethical and prohibited by his CFA code of conduct.

86. Based on reports received from Sharp Financial clients, Colglazier has used, and is continuing to use, the trade secrets he stole to contact Sharp Financial's clients on behalf of ASE and/or Belpointe.

87. Colglazier has misused Sharp Financial's trade secrets to contact the Company's clients in an organized and ongoing manner since August 12, 2026. His solicitation of clients (which, on information and belief, began before his last day of employment and, without a doubt, occurred on and after his last day of employment) has included use of internal business trade secret information and nonpublic information he stole from Sharp Financial including, without limitation, client AUM information, investments, asset allocations, financial planning, goals, tax information, the Client Information Trade Secrets, and the Technical Trade Secrets. Colglazier has

[2] At this time, Sharp Financial takes no position on whether Colglazier has separately breached duties to the clients he serviced and/or CFA duties.

used this Company information to disrupt the relationship between those clients and Sharp Financial.

88. Colglazier has used information which is not publicly available to solicit Sharp Financial's clients, including information he could only have derived from Sharp Financial's systems and/or platforms.

89. Colglazier has contacted Company clients who he knew had a contract and/or economic relationship with Sharp Financial.

90. Colglazier contacted Company clients intending to disrupt the performance of the Company's contracts with those clients and/or the economic relationship between Sharp Financial and those clients.

91. Colglazier knew that disruption of performance and/or the economic relationship was certain or substantially certain to occur.

92. Sharp Financial's economic relationship and the performance of contracts with clients have been disrupted because of Colglazier's conduct.

93. Sharp Financial has incurred losses of client accounts and/or client fees because of Colglazier's conduct.

94. Colglazier's contact with Sharp Financial clients has caused damages because of Colglazier's misappropriation and interference.

95. Colglazier is free to leave Sharp Financial and to compete with Sharp Financial in a lawful manner, consistent with applicable federal and state laws and other regulations. But Colglazier cannot ignore his fiduciary, statutory, and common-law obligations to Sharp Financial and exploit Sharp Financial's confidential and

proprietary information, including Sharp Financial's trade secrets. Consequently, Sharp Financial seeks injunctive relief, compensatory damages, and punitive damages against Defendants for their wrongful and harmful conduct.

96. The instances of misappropriation included in this Complaint are based on information Sharp Financial has discovered to date. Sharp Financial believes it will continue to uncover additional evidence of Defendants' misconduct.

## V. <u>Sharp Financial's Attempts to Resolve Issues Without Court Intervention</u>

97. On August 21, 2026, the Company sent Colglazier a written demand reminding Colglazier of his post-employment obligations and asking him to confirm, by August 28, 2026, his receipt of the letter, his understanding of his post-employment obligations, and that he had not retained, used, or disclosed any of the Company's confidential information. **Exhibit 1.**

98. Colglazier ignored the August 21 letter.

99. On September 6, 2026, the Company sent Colglazier a second written demand concerning his ongoing misconduct. **Exhibit 2**. In the September 6 letter, the Company demanded, among other things, that Colglazier return to Sharp Financial all of the materials he retained or to which he had access, agree to a forensic inspection and remediation of his devices and electronic accounts, disclose all instances where he used non-public information related to Sharp Financial, and agree not to use Sharp Financial confidential information moving forward. *Id.*

100. The Company also sent cease and desist letters to ASE and Belpointe concerning Colglazier's misconduct. **Exhibits 3, 4.**

101. Through counsel, Defendants responded to the September 6 letters, denied wrongdoing, and refused to immediately cease and desist their illegal conduct or to consent to the forensic inspection necessary to protect the Company's trade secrets and confidential information. Additional pre-litigation discussions have been unsuccessful.

102. Defendants' unwillingness to resolve this matter has forced Sharp Financial to seek the Court's intervention to ensure Sharp Financial's interests are protected.

103. The Company's investigation remains ongoing, and the Company fully expects to uncover additional misconduct by Colglazier.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT 18 U.S.C. §§ 1831, *et seq*.

**(Against All Defendants)**

104. Sharp Financial incorporates the allegations set forth in Paragraphs 1 through 103 as if the same were fully set forth at length herein.

105. The information contained in the documents and the proprietary files Colglazier unlawfully retained, including Sharp Financial's Technical Trade Secrets and Client Information Trade Secrets constitute Sharp Financial's trade secrets subject to protection under the DTSA.

106. These data were used to service Sharp Financial's clients across the country. Indeed, Sharp Financial operates physical offices in Florida, New Jersey, New York, and Pennsylvania, and services clients nationwide.

107. Sharp Financial's investigation is ongoing, and Sharp Financial remains concerned that Colglazier has taken other Sharp Financial trade secrets that have not yet been identified through forensics. To the extent Colglazier has taken additional Sharp Financial trade secrets, that information must not be used or disclosed by Sharp and/or ASE and Belpointe, and must be immediately returned to Sharp Financial.

108. The identified information and proprietary documents are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.

a. The Company's financial modeling and planning strategies are proprietary financial models and technical processes that the Company researched, developed, and implemented as part of its core business offerings to its clients. Those models and strategies are unique to the Company and represent a textbook trade secret. The Company uses these trade secrets to enhance its client services and increase its revenue.

b. The Company's IFM Solutions uniquely combines business advisory, accounting, tax, wealth management, asset management, investment banking, and family-office

services. This proprietary and unique approach creates significant competitive advantage for the Company.

c. The Company's client and confidential financial and account information are also core trade secrets.

109. Sharp Financial's trade secret information is related to services used in, and intended for use in, interstate commerce, namely its financial services offerings. 18 U.S.C. § 1836(b)(1).

110. The Client Information Trade Secrets are also protected as "non-public" information under federal securities Regulation S-P. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u). Accordingly, Sharp Financial is required by federal law to ensure that non-public customer contact, financial, and account information such as that misappropriated by Defendants is not disclosed to third parties without consent. 17 C.F.R. § 248.10.

111. Sharp Financial derives significant economic benefit from the above-described trade secrets, including significant revenues.

112. Sharp Financial faces an immediate threat of continuing harm, for which Sharp Financial lacks an adequate remedy at law, from Defendants' ongoing misappropriation and misuse of Sharp Financial's trade secret financial modeling and planning strategies, implementing rules, the Technical Trade Secrets, and the Client Information Trade Secrets.

113. Sharp Financial takes, and at all times has taken, reasonable measures to maintain the confidential and secret nature of this information. Those steps include, without limitation (a) restricting availability of certain confidential information to key employees; (b) physical security measures to protect against the disclosure of sensitive materials to third parties; and (c) IT security measures, such as multi-factor password-protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

114. On information and belief, Colglazier exfiltrated Sharp Financial's trade secrets by improper means in violation of his legal obligations to Sharp Financial, including by storing that information in his personal cell phone.

115. Colglazier acquired the information and proprietary documents at issue under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Colglazier owed, and continues to owe, to Sharp Financial, as an executive, officer, agent, employee, and representative of Sharp Financial.

116. On information and belief, Colglazier has used Sharp Financial's trade secret information to benefit and generate revenue for his new employers – ASE and Belpointe.

117. Colglazier has used Sharp Financial's trade secrets within the scope of his employment with ASE and Belpointe such that a causal nexus exists between Colglazier's acts of misappropriation and his work for ASE and Belpointe.

118. Unless Defendants are enjoined from their ongoing illegal conduct, Sharp Financial will be harmed by:

a. Defendants' use of Sharp Financial's proprietary financial modeling and planning strategies to solicit and service clients, including Sharp Financial's clients;

b. Disclosure of trade secrets, client lists, and other trade secret confidential information that is solely the property of Sharp Financial and its clients;

c. Use of Sharp Financial's trade secrets to solicit clients on behalf of Sharp Financial's competitors;

d. Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

e. Future economic loss, which is presently incalculable.

119. Defendants' conduct, both before and after they were put on notice of Colglazier's illegal conduct, constitutes a willful and malicious misappropriation of Sharp Financial's trade secrets.

120. Thus, Sharp Financial is entitled to injunctive relief to enjoin further legal violations and damages for the harm Defendants' illegal conduct has caused.

## COUNT II

## VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT FLA. STAT. §§ 688.001, *et seq.*

## (Against All Defendants)

121. Sharp Financial incorporates the allegations set forth in Paragraphs 1 through 103 as if the same were fully set forth at length herein.

122. The information contained in the documents and the proprietary files Colglazier unlawfully retained, including Sharp Financial's Technical Trade Secrets and Client Information Trade Secrets constitute Sharp Financial's trade secrets subject to protection under FUTSA. The information qualifies as a trade secret under Fla. Stat. § 688.002 because Sharp Financial derives independent economic value—actual or potential—from such information not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.

123. Sharp Financial's investigation is ongoing, and Sharp Financial remains concerned that Colglazier has taken other Sharp Financial trade secrets that have not yet been identified through forensics. To the extent Colglazier has taken additional Sharp Financial trade secrets, that information must not be used or disclosed by Sharp and/or ASE and Belpointe, and must be immediately returned to Sharp Financial.

124. The identified information and proprietary documents are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.

a. The Company's financial modeling and planning strategies are proprietary financial models and technical processes that the Company researched, developed, and implemented as part of its core business offerings to its clients. Those models and strategies are unique to the Company and represent a textbook trade secret. The Company uses these trade secrets to enhance its client services and increase its revenue.

b. The Company's IFM Solutions uniquely combines business advisory, accounting, tax, wealth management, asset management, investment banking, and family-office services. This proprietary and unique approach creates significant competitive advantage for the Company.

c. The Company's client and confidential financial and account information are also core trade secrets.

125. Sharp Financial derives significant economic benefit from the above-described trade secrets, including significant revenues.

126. Sharp Financial faces an immediate threat of continuing harm, for which Sharp Financial lacks an adequate remedy at law, from Defendants' ongoing misappropriation and misuse of Sharp Financial's trade secret financial modeling and planning strategies, implementing rules, Technical Trade Secrets, and Client Information Trade Secrets.

127. Sharp Financial takes, and at all times has taken, reasonable measures to maintain the confidential and secret nature of this information. Those steps include, without limitation: (a) restricting availability of certain confidential information to key employees; (b) physical security measures to protect against the disclosure of sensitive materials to third parties; and (c) IT security measures, such as multi-factor password-protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

128. On information and belief, Colglazier exfiltrated Sharp Financial's trade secrets by improper means in violation of his legal obligations to Sharp Financial, including by storing that information in his personal cell phone.

129. Colglazier acquired the information and proprietary documents at issue under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Colglazier owed, and continues to owe, to Sharp Financial, as an executive, officer, agent, employee, and representative of Sharp Financial.

130. On information and belief, Colglazier has used Sharp Financial's trade secret information to benefit and generate revenue for his new employers – ASE and Belpointe.

131. Colglazier has used Sharp Financial's trade secrets within the scope of his employment with ASE and Belpointe such that a causal nexus exists between Colglazier's acts of misappropriation and his work for ASE and Belpointe.

132. Unless Defendants are enjoined from their ongoing illegal conduct, Sharp Financial will be harmed by:

a. Defendants' use of Sharp Financial's proprietary financial modeling and planning strategies to solicit and service clients, including Sharp Financial's clients who Colglazier solicited away from Sharp Financial;

b. Disclosure of trade secrets, client lists, and other trade secret confidential information that is solely the property of Sharp Financial and its clients;

c. Use of Sharp Financial's trade secrets to solicit clients on behalf of Sharp Financial's competitors;

d. Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

e. Loss of ability to implement and manage financial strategies for Sharp Financial clients based on Colglazier's theft of the Model Strategies; and

f. Future economic loss, which is presently incalculable.

g. Defendants' conduct, both before and after they were put on notice of Colglazier's illegal conduct, constitutes a

willful and malicious misappropriation of Sharp Financial's trade secrets.

133. Thus, Sharp Financial is entitled to relief to enjoin further legal violations and damages for the harm Defendants' illegal conduct has caused.

**COUNT III**[3]

**BREACH OF FIDUCIARY DUTY**

**(Against Defendant Colglazier)**

134. Sharp Financial incorporates the allegations set forth in Paragraphs 1 through 103 as if the same were fully set forth at length herein.

135. On or around November 30, 2023, Colglazier was appointed the Chief Investment Officer of Sharp Wealth Advisory, LLC. **Exhibit 6.**

136. In his role as CIO, Colglazier was "responsible for leading, overseeing, and managing the investment platforms . . .and strategies of Sharp Wealth Advisory, LLC." *Id.* "In addition to contributing to the Group's leadership, strategic vision, and execution, you will also be a member of the leadership team of The Sharp Financial Group and collaborate with Sharp's team members in delivering our integrated financial management solutions." *Id.* "Also, as CIO, you will represent the Group's investment strategies, and all related solutions to wealth advisors and clients." *Id.*

---

[3] To the extent necessary, this cause of action is pled in the alternative to Sharp Financial's claim that Colglazier breached his common-law duties of loyalty owed to Sharp Financial as an employee.

137. Among Colglazier's enumerated CIO responsibilities was Colglazier's obligation to manage and grow the assets under management, manage the investment platform "including developing value-added offerings, "[o]verse all investment strategies" and lead the investment management team. *Id.*

138. Colglazier was handsomely compensated for his C-suite promotion: as of November 2023, he was paid over $250,000 in base salary with substantial bonus opportunities. *Id.*

139. In 2023, Colglazier received over $300,000 in compensation.

140. In 2024, Colglazier received nearly $350,000 in compensation.

141. In 2025, Colglazier received over $364,000 in compensation.

142. In 2026, as of his last day of work (August 12, 2026), Colglazier received over $240,000 in compensation.

143. Colglazier was a highly compensated C-suite executive with Sharp Financial who spent years leading Sharp Financial's investment strategy, and developing and incorporating that strategy (and other complementary strategies) into the Technical Trade Secrets.

144. As an officer of Sharp Financial, Colglazier owed Sharp Financial fiduciary duties.

145. Under Florida law, "'[o]fficers and directors of a corporation are liable for damages to the corporation which result from a breach of their trust, a violation of their authority or neglect of duty.'" *Peyton v. Grant*, Case No. 24-cv-21649-

ELFENBEIN, 2026 WL 327936, at *5 (S.D. Fla. Feb. 6, 2026) (quoting *Flight Equip. & Eng'g Corp. v. Shelton*, 103 So. 2d 615, 627 (Fla. 1958)).

146. "An officer breaches the duty of loyalty when he . . . acts adversely to the corporation's interests – such as by diverting corporate opportunities, misusing corporate resources, or profiting at the corporation's expense." *Id.* at *6 (citing *Cohen v. Hattaway*, 595 So. 2d 105, 108 (Fla. 5th DCA 1992); *Flight Equip.*, 103 So. 2d at 621)). "In sum, disloyal conduct – such as fraud, self-dealing, usurping corporate opportunities, diverting revenues, or other betrayal of trust – constitutes a breach of fiduciary duty under Florida law." *Id.*

147. Colglazier breached his fiduciary duties to Sharp Financial by, among other things, soliciting Sharp Financial's clients on behalf of ASE and Belpointe during and up to his last day of employment at Sharp Financial; stealing Sharp Financial's financial modeling and planning strategies and implementing rules; failing to adequately record and/or document portions of the Technical Trade Secrets; and using Sharp Financial client information to benefit ASE and Belpointe and harm Sharp Financial.

148. Sharp Financial did not authorize Colglazier to use Sharp Financial's proprietary financial modeling and planning strategies, implementing rules, or client information to benefit ASE, Belpointe, or any other competing business.

149. Colglazier's conduct was intentional, knowing, and undertaken for Colglazier's own benefit and for the benefit of ASE and Belpointe, and to the detriment of Sharp Financial.

150. Colglazier undertook this illegal course of conduct willfully, maliciously, and with reckless disregard for Sharp Financial's interests.

151. As a direct and proximate result of Colglazier's breach of his fiduciary duties to Sharp Financial, the Company has suffered damages, including loss of control over confidential and proprietary information, loss of access to its own proprietary financial modeling and planning strategies, loss or threatened loss of business opportunities, impairment of costumer and (now) former-customer relationships, damage to goodwill, investigative and remediation costs, and other damages to be proven at trial.

## COUNT IV

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

## (Against Defendants ASE and Belpointe)

152. Sharp Financial incorporates the allegations set forth in Paragraphs 1 through 103 as if the same were fully set forth at length herein.

153. As a senior executive at Sharp Financial, and as described in greater detail above, Colglazier owed – and continues to owe – Sharp Financial fiduciary duties.

154. Colglazier breached his fiduciary duties to Sharp Financial by, among other things, soliciting Sharp Financial's clients on behalf of ASE and Belpointe up to and during his last day of employment at Sharp Financial; stealing Sharp Financial's financial modeling and planning strategies and implementing rules; and using Sharp Financial client information to benefit ASE and Belpointe and harm Sharp Financial.

155. ASE and Belpointe knew Colglazier owed fiduciary duties to Sharp Financial when they hired him because Colglazier was an officer of Sharp Financial – and has now been named ASE's Chief Investment Officer – MD Client Group.

156. ASE and Belpointe have known of Colglazier's ongoing breaches of fiduciary duties. Certainly, no later than September 6, 2026, when ASE and Belpointe received Sharp Financial's cease and desist letters, ASE and Belpointe had actual knowledge of Colglazier's ongoing breaches of fiduciary duties.

157. ASE and Belpointe assisted Colglazier in breaching his fiduciary duties to Sharp Financial by, among other things, hiring him, providing him the infrastructure and platform to solicit Sharp Financial's clients, and the ability to implement Sharp Financial's proprietary financial modeling and planning strategies.

158. As a direct and proximate result of ASE and Belpointe aiding and abetting Colglazier's breach of his fiduciary duties to Sharp Financial, the Company has suffered damages, including loss of control over confidential and proprietary information, loss of access to its own proprietary financial modeling and planning strategies, loss or threatened loss of business opportunities, impairment of costumer and (now) former-customer relationships, damage to goodwill, investigative and remediation costs, and other damages to be proven at trial.

## COUNT V[4]

## BREACH OF THE COMMON LAW DUTY OF LOYALTY

## (Against Defendant Colglazier)

159. Sharp Financial incorporates the allegations set forth in Paragraphs 1 through 103 as if the same were fully set forth at length herein.

160. Separate and apart from his fiduciary duties as an officer of Sharp Financial, Colglazier owed common law duties of loyalty to Sharp Financial as a Company employee. *See OPS Int'l, Inc. v. Ekeanyanwu*, 672 F. Supp. 3d 1228, 1236 (M.D. Fla. 2023) (explaining that "[i]t is well-established under Florida law that an employee owes a fiduciary duty and a duty of loyalty to his . . .employer.") (citation modified).

161. Among other things, "an employee owes a fiduciary duty of loyalty to his . . . employer not to engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or solicitating customers . . . prior to the end of his employment." *Id.* (citation modified).

162. Colglazier breached his common law fiduciary duty and duty of loyalty owed to Sharp Financial as a Company employee by, among other things, soliciting Sharp Financial's clients on behalf of ASE and Belpointe up to and during his last day of employment at Sharp Financial; stealing Sharp Financial's financial modeling and

---

[4] To the extent necessary, this cause of action is pled in the alternative to Sharp Financial's claim that Colglazier breached his fiduciary duties to Sharp Financial as a Company officer.

planning strategies and implementing rules; and using Sharp Financial client information to benefit ASE and Belpointe and harm Sharp Financial.

163. Sharp Financial did not authorize Colglazier to use Sharp Financial's proprietary financial modeling and planning strategies, implementing rules, or client information to benefit ASE, Belpointe, or any other competing business.

164. Colglazier's conduct was intentional, knowing, and undertaken for Colglazier's own benefit and for the benefit of ASE and Belpointe, and to the detriment of Sharp Financial.

165. Colglazier undertook this illegal course of conduct willfully, maliciously, and with reckless disregard for Sharp Financial's interests.

166. As a direct and proximate result of Colglazier's breach of his common-law fiduciary duty and duty of loyalty to Sharp Financial, the Company has suffered damages, including loss of control over confidential and proprietary information, loss of access to its own proprietary financial modeling and planning strategies, loss or threatened loss of business opportunities, impairment of costumer and (now) former-customer relationships, damage to goodwill, investigative and remediation costs, and other damages to be proven at trial.

## COUNT VI

## AIDING AND ABETTING BREACH OF COMMON LAW DUTY OF LOYALTY

**(Against Defendants ASE and Belpointe)**

167. Sharp Financial incorporates the allegations set forth in Paragraphs 1 through 103 as if the same were fully set forth at length herein.

168. As a Sharp Financial employee, Colglazier owed Sharp Financial common-law fiduciary duties and a duty of loyalty.

169. Colglazier breached his employment-based common-law fiduciary duty and duty of loyalty to Sharp Financial by, among other things, soliciting Sharp Financial's clients on behalf of ASE and Belpointe up to and during his last day of employment at Sharp Financial; stealing Sharp Financial's financial modeling and planning strategies and implementing rules; and using Sharp Financial client information to benefit ASE and Belpointe and harm Sharp Financial.

170. ASE and Belpointe knew Colglazier owed employment-based common-law duties to Sharp Financial when they hired him because Colglazier was an employee of Sharp Financial.

171. ASE and Belpointe have known of Colglazier's ongoing breaches of fiduciary duties. Certainly, no later than September 6, 2026, when ASE and Belpointe received Sharp Financial's cease and desist letters, ASE and Belpointe had actual knowledge of Colglazier's ongoing breaches of fiduciary duties.

172. ASE and Belpointe assisted Colglazier in breaching his fiduciary duties to Sharp Financial by, among other things, hiring him, providing him the infrastructure and platform to solicit Sharp Financial's clients, and the ability to implement Sharp Financial's proprietary financial modeling and planning strategies.

173. As a direct and proximate result of ASE and Belpointe aiding and abetting Colglazier's breach of his employment-based common-law fiduciary duty and duty of loyalty to Sharp Financial, the Company has suffered damages, including loss of control over confidential and proprietary information, loss of access to its own proprietary financial modeling and planning strategies, loss or threatened loss of business opportunities, impairment of costumer and (now) former-customer relationships, damage to goodwill, investigative and remediation costs, and other damages to be proven at trial.

**COUNT VII**

**TORTIOUS INTERFERENCE WITH SHARP FINANCIAL'S BUSINESS OPPORTUNITIES**

**(Against All Defendants)**

174. Sharp Financial incorporates the allegations set forth in Paragraphs 1 through 103 as if the same were fully set forth at length herein.

175. Sharp Financial had existing and prospective business opportunities and advantageous business relationships with clients, prospective clients, former clients, inactive clients, partners, and business accounts that Sharp Financial was pursuing.

176. Sharp Financial's business opportunities and relationships were identifiable and concrete. They were reflected in Sharp Financial's client information,

CRM, active client lists, inactive client information, client communications, client contact information, and other internal business records.

177. As Chief Investment Officer, Colglazier knew of Sharp Financial's business opportunities and relationships.

178. Defendants, through Colglazier's pre- and post-resignation conduct, have intentionally and unjustifiably interfered with Sharp Financial's business opportunities.

179. On August 12, 2026, minutes after Colglazier submitted his resignation to Sharp Financial, Sharp Financial clients began transferring their accounts out of Sharp Financial and, on information and belief, to ASE and/or Belpointe.

180. That raid on Sharp Financial's clients has continued unabated, despite two cease and desist letters.

181. Defendants' interference was also improper because Defendants used or attempted to use knowledge gained from Sharp Financial, including knowledge of Sharp Financial's clients, former clients, pending opportunities, business strategy, growth strategy, proprietary integrated financial business strategy, and other confidential and proprietary Sharp Financial information for their own benefit.

182. As a direct and proximate result of Defendants' intentional and unjustified tortious interference, Sharp Financial has suffered damages.

183. Defendants' conduct was intentional, willful, malicious, and undertaken with knowledge that Sharp Financial had existing and prospective business opportunities and relationships that would be harmed by Defendants' conduct.

## COUNT VIII

## TORTIOUS INTERFERENCE WITH SHARP FINANCIAL'S CONTRACTUAL RELATIONS

## (Against All Defendants)

184. Sharp Financial incorporates the allegations set forth in Paragraphs 1 through 103 as if the same were fully set forth at length herein.

185. Sharp Financial has contracts to provide financial planning, tax, and other services comprising the IFM Solutions to clients. These contracts state that the client appoints Sharp Financial as an Investment Adviser, to, among other things, invest the client's assets. In exchange for Sharp Financial's services, Sharp Financial can receive revenues through fees charged as a percentage of the clients' assets under management (*i.e.*, the value of the clients' accounts) with the Company. Those fees can be allocated to the array of complementary services the Company offers to its clients.

186. The parties to these contracts are the client (on the one hand) and Sharp Financial (on the other hand).

187. Defendants knew of the contracts Sharp Financial has with its clients.

188. Colglazier knew of the contracts because of his role as Sharp Financial's Chief Investment Officer (which, among other things, gave him detailed insights into the overall financial performance and strategy of the Company across all business units) and as an investment adviser employed by Sharp Financial.

189. ASE and Belpointe knew, or should have known, of these contracts because they are industry standard in the wealth management and investment advisor industry.

190. Further, ASE/Belpointe are vicariously liable for Colglazier's conduct as their employee.

191. Based on reports received from clients, Defendants have used Sharp Financial's confidential information, proprietary business information, and trade secrets to contact Sharp Financial's clients and induce them to move their business from Sharp Financial to ASE and/or Belpointe.

192. Defendants contacted Sharp Financial clients whom they knew had contractual relationships with Sharp Financial.

193. Defendants contacted Sharp Financial clients intending to disrupt the performance of those clients' contractual relationships with Sharp Financial.

194. Defendants intended, and knew, that disruption of the performance of those clients' contractual relationships with Sharp Financial was certain or substantially certain to occur. This includes, without limitation, serious interruptions in the tax-planning services Sharp Financial provides to its clients.

195. Sharp Financial's performance of contracts with its clients have been disrupted because of Defendants' conduct.

196. Sharp Financial has suffered losses of client accounts or client fees because of Defendants' conduct.

197. Defendants' conduct was a substantial factor in causing Sharp Financial's harm.

198. Sharp Financial is entitled to damages for Defendants' intentional interference with Sharp Financial's contractual relationships. Sharp Financial has suffered far more than $75,000 in damages.

199. Defendants' actions were willful, intentional, and malicious, and calculated to damage Sharp Financial.

## REQUEST FOR RELIEF

For the foregoing reasons, Sharp Financial respectfully requests that the Court grant the following relief:

A. Enter a permanent injunction enjoining Defendants from using, accessing, or disclosing any of Sharp Financial's confidential information, proprietary information, and/or trade secrets;

B. Enter judgment for monetary damages for Defendants' wrongful acts described in the Complaint including, without limitation, actual damages (including all damages incurred by Sharp Financial), punitive damages, pre-litigation attorneys' fees and costs, Colglazier's unjust enrichment, and any ill-gotten gains as a result of Defendants' unlawful acts;

C. Award exemplary damages for Defendants' malicious violation of the DTSA and the FUTSA;

D. Award punitive damages for Defendants' malicious tortious interference with Sharp Financial's prospective business relations and contractual relations, and

Colglazier's breaches of his fiduciary duties and duty of loyalty owed to Sharp Financial; and

E. Award any other relief that the Court deems just and proper.

**JURY TRIAL DEMANDED**

The Company demands a trial by jury on all issues so triable. *See* FED. R. CIV. P. 38, 39.

Respectfully submitted on September 25, 2026.

**FISHER & PHILLIPS LLP**

By: */s/ Brett P. Owens*
Brett P. Owens, B.C.S.
Florida Bar No. 0112677
bowens@fisherphillips.com
401 East Jackson Street, Suite 3100
Tampa, FL 33602
Telephone: (813) 769-7500
Facsimile: (813) 769-7501

***Attorneys for Plaintiffs***